# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### WDNC Civil Action No.

**KYRE MITCHELL,**

*Plaintiff,*

v.

**The CITY OF CHARLOTTE, KERR PUTNEY, in his official capacity as former Chief of Charlotte-Mecklenburg Police Department ("CMPD"); JOHNNY LEE JENNINGS, in his official capacity as current CMPD Chief; Kerr Putney, in his official and individual capacity as former CMPD Chief; STEVEN VOORHEES, in his official capacity as the CMPD Deputy Chief; Major ROBERT DANCE, individually and in his official capacity; Major NELSON BOWLING, individually and in his official capacity; Lieutenant CHRISTOPHER RORIE, individually and in his official capacity; Sergeant SCOTT SHERWOOD, individually and in his official capacity; CMPD officers KENNETH TUCKER, MICHAEL PUTNAM, DANIEL MARTINEZ, JC LONG, WILLIAM BROADWAY, GARY POTTER, CASEY SHUE, MASON BRIAN BRASWELL, EDWARD KAMINSKI, S. DOWELL, and AMANDA KELLER, individually and in their official capacities; and JOHN DOE 1 - 50, individually and in their official capacity as officers or agents of CMPD and Civil Emergency Unit.**

*Defendants.*

**COMPLAINT**
**(with jury demand)**

1

Plaintiff Kyre Mitchell hereby files this Complaint against the Defendants, and alleges:

**<u>INTRODUCTION</u>**

But somewhere I read of the freedom of assembly. Somewhere I read of the freedom of speech. Somewhere I read of the freedom of press. Somewhere I read that the greatness of America is the right to protest for rights. [1]

1.      The document to which Nobel Laureate, Dr. Martin Luther King, Jr., referred is the First Amendment to the United States Constitution. Unfortunately, some members of the Charlotte-Mecklenburg Police Department ("CMPD") and other law enforcement agencies, pursuant to a mutual aid agreement, had no regard for the rights secured by this bedrock principle of American democracy. This case is the sad tale of police officers, clothed with the awesome power of the state, run amok.

2.      On May 30, 2020, Kyre Mitchell (hereinafter, "Plaintiff Mitchell" or "Mr. Mitchell") peacefully exercised his constitutional right to assemble and protest the pervasive and unjustifiable violence against Black and Brown people across the United States, including in Charlotte, North Carolina. Painfully, Mr. Mitchell was violently assaulted and permanently maimed by Defendants that night, who recklessly used weapons and other needlessly dangerous tactics under the guise of "crowd control" to suppress, deter, and injure Mr. Mitchell – and others who similarly sought to exercise their First Amendment right to peaceably protest police violence and brutality.

3.      Following the murder of George Floyd on May 25, 2020, who was recorded pleading for his life ("I can't breathe") while a police officer kneeled on his neck and killed him, people around the United States, including thousands in the City of Charlotte, took to the

---

[1] https://kinginstitute.stanford.edu/encyclopedia/ive-been-mountaintop

streets to exercise their First Amendment right to peaceably assemble to protest this injustice, as well as grieve the deaths of other Black and Brown citizens, including, but not limited to, Breonna Taylor and Ahmaud Arbury.

4. The Charlotte-Mecklenburg Police Department (CMPD), in response, sought to discourage and suppress these protests. Every day, from Thursday, May 28, 2020 through at least Tuesday, June 2, 2020, CMPD and other named Defendants used various violent and excessive methods of force to discourage and suppress peaceful protests and demonstrations in public spaces throughout Charlotte. Defendants deployed tear gas, flashbangs, and other chemical munitions, including, but not limited to, CS gas, OC vapor, pepper balls, smoke chasers and "stinger" flash bang grenades upon Mr. Mitchell and others to terrorize, retaliate and punish Mr. Mitchell and other protesters for peacefully protesting against systemic police violence.

5. While Defendants have referred to their methods as "less lethal," these methods are, though, incredibly dangerous. For example, designed nearly 40 years ago to help military special forces rescue hostages, flashbangs create a stunningly bright burst of light and an ear-splitting boom that temporarily blind and deafen anyone standing within a few feet of them. When these modified hand grenades explode on the human body, as they did to Mr. Mitchell, they can cause severe injury or death.

6. Defendants knowingly placed the Mr. Mitchell and other peaceful protesters in physical danger through their intentional, indiscriminate, and overwhelming use of excessive force. This excessive use of force injured many protesters and discouraged others from exercising their constitutional rights, suppressed protesters' free speech, and infringed on the rights of legal observers, journalists, and medical personnel seeking to perform their duties at

3

protest sites.

7.    Defendants also knowingly created a danger to the public health by intentionally "kettling" (corralling) Mr. Mitchell and other protestors. This practice forced Mr. Mitchell and others to break social distancing rules at the height of the COVID-19 pandemic. It also placed Mr. Mitchell and others in an incredibly dangerous predicament, essentially trapping them so that Defendants could exert additional harm. Indeed, "kettling" is a highly suspect tactic because it traps people with no immediate way out, indiscriminately subjecting all to the same violent treatment via "less-lethal" munitions regardless of individual conduct. Defendants knew this and used this "kittling" technique accordingly. For example, body camera footage from in and around the same city blocks where Mr. Mitchell was injured, shows supervisory CMPD officer, Defendant Scott Sherwood, instructing others to corral, or "kettle," protestors into a tight space and deploy chemical weapons and kinetic projectiles. Sherwood stated:

> We're going to push their asses straight up 4th. As soon as they get up on 4th — we got [them] bottlenecked now — then [Lt. Chris] Rorie's squad is gonna step out and hammer their asses. When they start running down, [Maj. Robert] Dance's squad is gonna step out and hammer their ass with gas. We're gonna [expletive] pop it up![2]

On information and belief, CMPD officers, including Defendants Sherwood, Rorie, and Dance, employed the same militant tactics under the guise of "crowd control" on May 30, 2020.

8.    As a result of the excessive force perpetrated by CMPD officers, Plaintiff Kyre Mitchell suffered grievous physical injuries, including, but not limited to, the loss of two fingers on his right (dominant) hand and deep burns to his palm. These injuries cause Mr.

---

[2] *"We're Trapped!"- Inside the Violent Police Kettle of Black Lives Matter Protesters in Charlotte*, THE INTERCEPT, *available at* https://theintercept.com/2021/06/02/kettling-protests-charlotte-police/ (accessed June 27, 2022).

4

Mitchell pain and embarrassment to this day, and permanently prevent or limit his ability to do activities he used to enjoy, or which used to provide him income. Mr. Mitchell has also suffered disorientation, sleeplessness, extended and continuing periods of fearfulness and anxiety as a result of Defendants' unlawful actions on May 30, 2020.

9. Plaintiff brings this action to seek damages for the injuries that Defendants directly and proximately caused. He furthers asks the Court to restrain the City of Charlotte and CMPD from further violence and unconstitutional conduct.

10. The below image of Mr. Mitchell's arm and hand was taken from the camera of Mr. Mitchell's iPhone following Defendants' actions described herein.

*[Graphic image on following page]*



## PARTIES

11.     Plaintiff Kyre Mitchell is a citizen and resident of Mecklenburg County, N.C., one of thousands of aggrieved citizens who participated in the multiple nights of protests and peaceful demonstrations in late May and early June 2020 following the death of George Floyd, including in the May 30, 2020 protest during which Plaintiff was injured. Mitchell sustained serious and lasting physical injuries from the premeditated, violent, unlawful and dangerous attacks on protesters that are the subject of this action.

12.     Defendant City of Charlotte ("City") is a municipal corporation organized by charter under Chapter 160A of the North Carolina General Statutes. The City maintains and operates a unified city-county police force called the Charlotte-Mecklenburg Police Department ("CMPD"). It also operates a Civil Emergency Unit ("CEU") established for responding to large public protests or any event which is thought to be appropriate by the Chief of Police or their designee. Employees of CMPD and CEU are employees and agents of the City, which bears the legal responsibility under state law for negligent acts and omissions of CMPD officers and CEU employees in the course of their employment.

13.     At all times relevant to this action, the City of Charlotte acted through its managers and policy makers, including the Chief of Police and other employees of the CMPD; and the acts, edicts and practices of said persons represent the official policies and practices of the Defendant City.

14.     The City of Charlotte bears legal responsibility under state law for acts and omissions of CMPD police officers and partnered law enforcement agencies through a mutual aid agreement, in the course of their employment. It is sued for the unconstitutional and dangerous policies and practices of its police department and other emergency officials that

7

occurred on and around May 30, 2020.

15.    Defendant Kerr Putney ("Chief Putney") is an adult citizen and resident of Mecklenburg County and was Chief of the CMPD on May 30, 2020. and at all times relevant to this complaint. He is sued in his personal and official capacity for the planned, unconstitutional use of force against peaceful demonstrators on and around May 18, 2020. On information and belief, namely the statement of the current Chief Jennings to the City Council regarding the incident, then–Chief Putney was present in the "Command Center" on May 30, 2020. If the evidence shows that Putney did not explicitly authorize the deployment of tear gas, flashbangs, and other chemical munitions before it occurred or lacked advance notice, he became aware of the deployment of chemical munitions as it occurred and ratified the actions of his officers after the fact, subjecting the City to liability for negligence. He is sued in his official capacity under state law for negligence, gross negligence and negligent infliction of emotional distress and the City has waived immunity from those claims.

16.    Defendant Johnny Jennings ("Chief Jennings") is an adult citizen and resident of Mecklenburg County who was named Chief of the CMPD effective July 1, 2020. He is sued in his official capacity as a substitute Defendant for Putney as the current Chief of Police, and for ratifying the actions of CMPD on May 30, 2020 in public statements. If the evidence shows that Chief Jennings did not authorize the deployment of tear gas, flashbangs, and other chemical munitions before it occurred or lacked advance notice, he became aware of the deployment of chemical munitions as it occurred and ratified the actions of his officers after the fact, subjecting the City to liability for negligence. He is sued in his official capacity under state law for negligence, gross negligence and negligent infliction of emotional distress and the City has waived immunity from those claims.

17.     By ordinance adopted by the City Council pursuant to N.C.G.S. § 160A-485.5, the City has waived governmental immunity from the negligence of its employees pursuant to the State Tort Claims Act.[3] That waiver applies to the negligence of officers in using chemical and other "less lethal" munitions like flash-bang grenades against Plaintiff on May 30, 2020.

18.     At all material times herein, the City was responsible for supervising, enacting, and enforcing the CMPD's conduct, policies, and practices; the absence of needed policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the OPD, including such employees as defendants Kenneth Tucker ("Tucker"), Michael Putnam ("Putnam"), Daniel Martinez ("Martinez"),  Scott Sherwood ("Sherwood"), JC Long ("Long"), William Broadway ("Broadway"), Gary Potter Jr. ("Potter"), Casey Shue ("Shue"), M. Braswell ("Braswell"), Edward Kaminski ("Kaminski"), S. Dowell ("Dowell"), Johnny Lee ("Lee"), Amanda Keller ("Keller"), and yet-to-be-identified CMPD agents, including police officers whom, on information and belief, were dressed in plainclothes on May 30, 2022.

19.     The City of Charlotte was also responsible for the actions of the members of their mutual aid network including, but not limited to, assisting officers from yet-to-be-identified surrounding Cities and Counties.

20.     The City of Charlotte and Mecklenburg County are two of the 47 Cities and Counties that have signed into the "Law Enforcement Mutual Aid Agreement" for equipment and personnel to be shared at request under NCGS 160A-288, 153A-212 and 90-95.2. The City of Charlotte facilitates this agreement.

---

[3] *See* Resolution Waiving Immunity for the City of Charlotte through the State Tort Claims Act, Resolution Book 42, Page 225, Charlotte, N.C. City Counsel (Oct. 12, 2009), *available at* https://charlottenc.gov/CityClerk/Resolutions/October%2012,%202009.pdf (accessed June 27, 2022).

21.     N.C.G.S. § 160A-288 authorizes the head of a county or city law enforcement agency, *e.g.* the elected sheriff or chief of police, or a person delegated authority by the agency head, to temporarily provide assistance to another law enforcement agency if the assistance is requested in writing by the head of the other agency. Only one (1) officer in the agency shall have the delegated authority at any one time.

22.     N.C.G.S. § 160A-288 authorizes agencies to loan: (1) officers, including in an undercover capacity; (2) equipment; and (3) supplies. The statute also authorizes agencies to assist in enforcing the laws of North Carolina. The statute specifically provides that while on duty with the requesting agency, an officer is subject to the lawful operational commands of his or her superior officers in the requesting agency. Such officers remain, however, under the control of their employing (*i.e.*, lending) agency for administrative and personnel purposes, including pay.

23.     While working with the requesting agency, an officer shall have the same jurisdiction, powers, rights and privileges as an officer of the requesting agency, in addition to those the officer normally possesses. This includes immunities relating to the defense of civil actions and payment of judgments. Further, assisting officers are entitled to workers' compensation and the same benefits as though they were functioning within the normal scope of their duties.

24.     For purposes of N.C.G.S. § 160A-288, "law enforcement agency" means only: (1) a sheriff's office; (2) a municipal police department; (3) A county police department; or (4) Local ABC officers.

25.     North Carolina General Statutes Chapter 160A, Article 20, Part 1, provides for "inter-local cooperation." Pursuant to these statutes, any unit of local government may enter

10

into contracts or agreements with each other in order to execute any undertaking. A "unit of government" is defined by N.C.G.S. § 160A-460(2) as "a county, city, consolidated city-county, local board of education, sanitary district, or other local political subdivision, authority, or agency of local government."

26.     North Carolina General Statutes § 153A-212 makes these statutes applicable to counties as well. An "undertaking" means the joint exercise by two or more units of local government of **any** power, function, public enterprise, right, privilege, or immunity of local government. Therefore, an "undertaking" can include law enforcement functions.

27.     Any such contract or agreement for the joint exercise of powers must be ratified by resolution of the governing board of each unit and be of reasonable duration. These statutes set forth the provisions that must be included in any contract or agreement, such as the conferring of powers, duties, rights, or functions upon a joint agency, appropriating funds to such agencies, and the appointment of personnel.

28.     The City of Concord, Town of Huntersville, City of Salisbury, Rowan County Sheriff's Office, NC State Highway Patrol, and other agencies, through Defendant City, (collectively, "Mutual Aid Agencies") are municipal corporations organized by charter under Chapter 160A of the North Carolina General Statutes. The Mutual Aid Agencies maintain and operate pursuant to a unified city-county police force in a Law Enforcement Mutual Aid Agreement.

29.     Mecklenburg County Emergency Management has a registry resource list for categorized equipment and resources from the state that are available to CMPD upon request. CMPD maintains working relationships with regional, local, state, and federal partners whose assets can be requested and provided as needed.

11

30.     Within CMPD's Special Operations Units such as Bomb, SWAT, Aviation, K9, and Civil Emergency Units, CMPD maintains contact with those agencies that would be called upon to provide assistance if CMPD asked directly. This includes State and Federal agencies, including the National Guard.

31.     CMPD has conducted Civil Emergency training for regional jurisdictions to include the Mecklenburg County Sheriff's Office, Huntersville Police Department, Salisbury Police Department, Rowan County Sheriff's Department, NC State Highway Patrol and others. CMPD has also had other agencies observe practical training exercises for its annual CEU training.

32.     On information and belief, in accordance with an existing mutual aid agreement with the Charlotte-Mecklenburg Police Department, adopted pursuant to N.C.G.S. § 160-A-288, Mutual Aid Agencies provided support in the form of personnel, tactical officers, and mobile support officers to the CMPD at the protests in downtown Charlotte on May 30, 2020. These Cities officers engaged in the same unlawful tactics as the CMPD officers named as Defendants herein—to wit—the indiscriminate use of chemical weapons, pepper balls, and flash-bang grenades. On information and belief, Mutual Aid Agencies deployed traditional aluminum or steel-body flash-bang ("stun" or "concussion") grenades on crowds of protesters on May 30, 2020, in addition to "stinger" rubber-ball grenades.

33.     Defendant City, through the actions of Mutual Aid Agencies, is liable for the actions of its officers acting in aid of the CMPD; on information and belief, the Mutual Aid Agreement and/or the Mutual Aid Operations Plan under which these officers operated provided that—although the officers were subject to the lawful commands of superior CMPD officers (as the requesting agency)—the Mutual Aid Agencies law enforcement officers would

12

continue to be governed by Charlotte Mecklenburg Police Department's use of force policies and procedures, and subject to Charlotte Mecklenburg Police Department personnel / disciplinary actions for any offending conduct while deputized as a mutual aid officer for neighboring jurisdictions.

34. Upon information and belief, the City of Charlotte administration, the City Manager, and the CMPD should lead all relevant City personnel, elected officials, mutual aid agencies and other stakeholders in NIMS/ICS training and practical exercises.

35. State and local emergency forces--i.e., police--do not await an emergency declaration to exert substantial control over protestors. Before a legal emergency, police activate mutual aid agreements to summon police from other intra-state jurisdictions. This acts as a multiplier to regular police forces.

36. Defendants Tucker, Putnam, Martinez, Sherwood, Long, Broadway, Potter, Shue, Braswell, Kaminski, Dowell, Lee, and Keller are sworn CMPD police officers whom, on information and belief, indiscriminately used chemical weapons and other "less lethal" munitions, including flash bang grenades and stinger grenades on peaceful protesters on May 30, 2020. On information and belief, one or more of these officers personally deployed the chemical munitions and the flash-bang grenade that caused the Plaintiff's injuries. Defendants John Does 1-50 are CMPD officers or law enforcement officers employed by neighboring Cities and Counties who provided aid to the CMPD on May 30, 2020, and whom also deployed flash-bang grenades, kinetic projectiles and chemical weapons on May 30. These Defendants are sued in their individual and official capacities.

37. Defendant Steven Voorhees ("Voorhees") is an adult citizen and resident of Mecklenburg County and a Deputy Chief of the CMPD. Based on his sworn affidavit in a

related action, on information and belief, he was on duty in the CMPD Command Center on May 30, 2020. If the evidence shows that Voorhees did not authorize the deployment of tear gas, flashbangs, and other chemical munitions before it occurred or lacked advance notice, he became aware of the deployment of these munitions as it occurred and ratified the actions of his officers after the fact, thus subjecting the City to liability for negligence. Deputy Chief Voorhees is sued in his official capacity under state law for negligence, gross negligence and negligent infliction of emotional distress and the City has waived immunity from those claims.

38.     Defendants Robert Dance, Nelson Bowling, Chris Rorie and Scott Sherwood are supervisory officers with the CPMD whom, on information and belief, were on duty and present at the May 30, 2020 protest and who lead or directed various "platoons" of CPMD officers and police officers from other departments in neighboring Cities or Counties, and who directed and/or approved of the widespread and indiscriminate use of chemical weapons, flash-bang grenades, and kinetic projectiles on peaceful protesters on that date. CMPD records suggest Defendant Sherwood himself deployed three "stinger" flash-bang grenades on crowds on May 30-31, 2020.

39.     Each defendant sued herein acted wrongfully, deliberately indifferent, negligently, and/or was otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff Mitchell.

40.     Each of the defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining defendants, and in doing the things hereinafter alleged, was acting within the course and scope of that relationship.

41.     On information and belief, each of the defendants named herein gave consent,

14

aid, and assistance to each of the remaining defendants, and ratified or authorized the acts or omissions of each defendant as alleged herein, except as may hereinafter be otherwise, specifically alleged.

42.    At all material times, each defendant was an integral participant, jointly and fundamentally engaged in constitutionally improper, unlawful, or tortious activity, resulting in the deprivation of the constitutional rights and other actionable harm to Plaintiff.

43.    The acts and omissions of all Charlotte-Mecklenburg or individual Defendants were at all material times pursuant to actual customs, policies, practices, and/or procedures of Charlotte Mecklenburg and/or the CMPD. Stated alternatively, the acts and omissions of all Defendants were at all material times taken pursuant to customs, policies, practices, and/or procedures of Charlotte Mecklenburg and/or the CMPD.

44.    Defendants John Doe 1-50 are the remaining, unidentified CMPD and CEU commanders and CEU officers involved in the protests, deployed at the street level. Plaintiff will ask the City to identify them in discovery. They are sued in their official capacities under state law for negligence, gross negligence and for negligent infliction of emotional distress, and the City has waived immunity from that claim. Each of them is also sued individually for assault, battery, false imprisonment, intentional infliction of emotional distress of Plaintiff, and so acted beyond the scope of his/her lawful authority with malice toward Plaintiff and with willful and wanton disregard for their rights and safety, and thereby has waived an entitlement to public officer immunity.

45.    At all material times, each defendant acted under color of the laws, statutes, ordinances, and regulations of the State of North Carolina.

### JURISDICTION & VENUE

46.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331

(claims arising under the U.S. Constitution) and 28 U.S.C. § 1343(a)(3) (claims to address deprivations, under color of state authority, of rights, privileges, and immunities secured by the U.S. Constitution), and 42 U.S.C. § 1983 (the federal civil rights statute).

47.     The state law claims here are so related to the federal claims in the action that they form part of the same case or controversy under Article III of the U.S. Constitution. The Court has supplemental jurisdiction over these claims under 28 U.S.C. § 1367.

48.     Venue is proper in the United States District Court for the Western District of North Carolina pursuant to 28 U.S.C. § 1391(b)(1) because defendants are located in the Western District of North Carolina and § 1391(b)(2) because all of the acts and/or omissions complained of herein occurred within the Western District of North Carolina.

### FACTS

49.     **The Death of George Floyd**. Just after 8:00 P.M. on May 25, 2020, George Floyd, a Black 46-year-old father, son, and brother, was accused of a non-violent offense and arrested by the Minneapolis police. In the process of his arrest, Mr. Floyd was handcuffed and taken to the pavement. Less than ten minutes after the police arrived, a police officer, Derek Chauvin, placed his knee and the weight of his entire body on Mr. Floyd's neck as Floyd lay on the ground unable to breathe, killing Mr. Floyd. For *nine minutes and twenty-nine seconds*, the officer held his knee on Mr. Floyd's neck and shoulder as Mr. Floyd pleaded for relief and aid. Three more officers helped Chauvin by pinning Mr. Floyd's legs or otherwise preventing witnesses from intervening and stood by watching while he died on the pavement.

50.     Among Mr. Floyd's final words were "please, please, please, I can't breathe." These words were reminiscent of the words spoken by Eric Garner before he was killed by a New York City police officer in 2014, which have since become a tragic rallying cry for people

seeking to end systemic racism, racial oppression, police brutality, the killing of Black people by law enforcement, and reform the American criminal legal system.

51. Mr. Floyd's horrific death was captured on video by bystanders who pleaded with police to get off his neck, and the principal officer involved, Derek Chauvin, was later convicted of second- and third-degree murder and manslaughter. The video was broadcast globally, sparking global protests against systemic racism and injustices perpetrated by law enforcement against Black people in the United States. The deaths of Floyd and Breonna Taylor, a Black woman who was killed in March 2020 by three Louisville police officers who

entered her home, in the middle of the night without knocking or identifying themselves and shot her eight times in her bed, only begin to scratch the surface in the number of Black people who were subjected to police brutality, systemic racism, and unjustifiably killed at the hands of law enforcement, and are just the latest examples of the violence perpetrated against Black people in the United States.

52.     **The Charlotte Protests**. Plaintiff Kyre Mitchell participated in a series of protests against systemic police violence against Black people and police killing Black people in America. These protests in the City of Charlotte began in late May shortly following Mr. Floyd's death. Specifically, each night between May 28, 2020 and continuing through at least June 2, aggrieved citizens peacefully protested in public spaces in and around the City.

53.     During these protests, CMPD officers employed increasingly violent police tactics to corral, intimidate, silence and injure protesters. Officers dressed in riot gear or in plainclothes released tear gas, unleashed flash bombs and grenades, and shot pepper bullets directly at protesters.

54.      Officers used these tactics indiscriminately, including on protestors (such as the Plaintiff) who were demonstrating peacefully, without first issuing warnings or providing sufficient time to disperse.

55.     At times, CMPD deployed flash bangs to ensure that protesters would endure pain and injury from weapons of mass destruction. CMPD officers furthermore deployed these weapons on crowds filled with bystanders who were not involved in the protests. In sum, these officers repeatedly violated these protesters and bystanders' constitutional rights.

56.     Throughout days of protests beginning on May 28, 2020, Defendant Vorhees, as Deputy Chief, and Defendant Putney, as Chief of Police, were made aware of the gratuitous

use of force by their officers.

57.     Hundreds of complaints were made by the protesters along with calls from elected officials, imploring that the CMPD and its officers stop using such violent and indiscriminate crowd control tactics.

58.      CMPD has body cameras which captured much of the police violence.

59.     Videos, photographs, and written accounts by individuals and news media were circulating online and being shown to Defendants Vorhees and Putney.

60.     In one such video streamed from local newspaper Queen City Nerve, officers were shown boxing in hundreds of protesters on Fourth Street on June 2, 2020, firing pepper tear gas and pepper bullets directly at the crowd.

61.     Nonetheless, these Defendants took no action to rein in their officers. They knew of the brutality being inflicted and they ratified it each day with their indifference or approval.

62.     These constitutionally protected and essential protests against systemic police violence occurred amid a global public health crisis. The novel coronavirus (COVID-19), has killed over one million Americans and continues to spread. The virus is commonly understood to be transmittable through exposure to respiratory droplets. Public health officials advised people to wear masks if they were outside and to stay six feet apart. In an effort to mitigate the number of people infected, the City had issued a shelter-in-place order in March 2020 to stem the spread of COVID-19 and implemented social distancing protocols. CMPD's use of flash bangs, which are weapons of mass destructions, thus also created a public health risk to Plaintiff and the other protesters on May 30, 2020.

63.     **The May 30, 2020 Protest and Plaintiff Mitchell's Injuries**. At or around

1:00 P.M. on May 30, 2020, demonstrators begun to assemble in peaceful protest of Floyd's death at the CMPD Headquarters located at 601 East Trade Street in Charlotte. Around the same time, others gathered at Marshall Park and other areas around the City. The demographics of the demonstrators included people of all different heritages and ages. On information and belief, some attendees were young children (under 12), while many demonstrators were high school students. The demonstrators practiced social distancing by wearing masks. The protest was peaceful. Police presence, however, increased. As the afternoon wore on, the Plaintiff and other demonstrators began to march through areas of Uptown Charlotte.

64.    At all relevant times, no incident occurred justifying CMPD to characterize the protests as an unlawful assembly or to use widespread, indiscriminate force against the crowd of demonstrators. At most, there were rare instances of individual demonstrators who damaged property or displayed anger and aggression towards officers, whom could have been singled out for removal from the protest using reasonable force, and lawfully arrested as appropriate.

65.    CMPD or members of their mutual aid network, including any and all assisting officers from to be identified surrounding Cities and Counties, then threw tear gas canisters, as well as flash-bang and "stinger" grenades into the crowd directly at the demonstrators. They also shot pepper ball projectiles indiscriminately into crowds of people; according to official records, CMPD officers fired 6,605 rounds of pepper ball bullets on May 30, 2020.

66.    Kyre Mitchell attended the protest on May 30; he participated at CMPD Central Division and later marched on Uptown Charlotte. Beginning in the early evening hours in and around the Uptown area, CMPD officers and law enforcement officers from their mutual aid network increasingly engaged in violent and intimidating tactics.

67.     There was no declaration made indicating that the protest / demonstration was an unlawful assembly.  If there was any such announcement, it was inaudible and/or unclear.

68.     At no point in time on May 30, 2020 did Plaintiff exhibit behavior suggesting he posed a threat to property or the safety of others; he simply observed the demonstrations and protested police violence peacefully.

69.     Law enforcement can call in excess police from surrounding jurisdictions via mutual aid agreements, utilize military grade equipment and tactics against activists, and employ existing laws to effectuate arrest.

70.     The statute specifically provides that while on duty with the requesting agency, an officer is subject to the lawful operational commands of his or her superior officers in the requesting agency. Such officers remain, however, under the control of their employing (i.e., lending) agency for administrative and personnel purposes, including pay.

71.     While working with the requesting agency, City of Charlotte, a mutual aid agency officer shall have the same jurisdiction, powers, rights and privileges as an officer of the requesting agency, in addition to those the officer normally possesses.

72.     Under information and belief, at approximately 9:13 pm time, Mr. Mitchell witnessed police filing out of a parking lot next to the Spectrum Center and shoving multiple protestors to the ground. Due to this unwarranted display of force, the demonstration broke into smaller groups and began to disintegrate. The police deployed rubber and pepper ball bullets, flashbangs, and chemical weapons, and began to corral protestors towards the Ritz Carlton. Officers shot protesters with projectiles at close range without warnings, injuring numerous people. Plaintiff was fired upon and struck by pepper ball guns and forced to run through clouds of CS/OC gas. He suffered a burning sensation to his skin and eyes, and at

21

times coughed violently to clear the noxious gas from his lungs and airways.

73.     Around 11:30 P.M., a crowd of protesters came to a standstill in Uptown near the intersection of Fifth Street and North Tryon Street. Defendants "kettled" peaceful protestors. Mr. Mitchell was not directly near the police, and many people in the area were not participating in the protest. CMPD, or members of their mutual aid network including assisting officers to be identified from surrounding Cities and Counties, without notice or instruction to disperse, began again to deploy tear gas, pepper bullets, and flashbang grenades in an area that contained not only peaceful protestors but bystanders.

74.     Amidst the chaos, Mitchell noticed a white car immediately beside him with a family with children in it. At that moment, he observed a police officer standing 50 feet away throw a device that landed directly at his feet. To protect the people in the car and other persons in the immediate vicinity, Mr. Mitchell quickly picked up the device so as to throw it in the opposite direction from where the family and any other people were located. Unfortunately, a fraction of a second later, the device exploded violently in his hand.

75.     On information and belief, this device was thrown by one of the Defendants Tucker, Putnam, Martinez, Sherwood, Long, Broadway, Potter, Shue, Braswell, Kaminski, Dowell, Lee, or Keller, *i.e.*, the CMPD officers who reported throwing flash-bang "stinger" grenades on May 30, 2020, and/or an officer from the CMPD's mutual aid network who deployed a flash-bang grenade under the direction or approval of a supervisory CMPD officer.

76.     Upon information and belief, the most common use for flashbangs and other distraction devices is to facilitate a dynamic entry by officers into a home, business, or other building, some agencies have used them in large open spaces and in streets and other public venues as a part of crowd control or dispersal, particularly in the context of large unruly

crowds, including street demonstrations. "Flash-bang" grenades often used by law enforcement officials are weapons of mass death and destruction. Any "grenade" subject to the prohibition on weapons of mass destruction must be capable of causing catastrophic damage consistent with the "highly deadly and destructive" nature of other items.

77.     Mr. Mitchell was taken by ambulance to the emergency room. He sustained an explosion injury to his right hand from a flash-bang grenade with degloving of the right middle finger and ring finger and injury to the thumb-index webspace. The palm surface of his right hand was badly burned. There was extensive skin loss to the top of Mr. Mitchell's middle and ring fingers; much of what remained was merely exposed bone.

78.     Mr. Mitchell underwent surgery and had a revision amputation of the right ring and middle fingers with debridement and closure of the thumb-index webspace. He experienced severe pain in his right hand that was worse with motion. He had multiple open wounds to his right hand with exposed bone on his fourth and third distal fingers, multiple lacerations to his right fingers with loose flaps of skin with chard burns, and bruising to his right palm. The soft tissue on his fingers was held in place by a ring that had to be cut off.

79.     The Orthopedic Surgeon felt there was not enough skin to repair the patient's lacerations.  Mr. Mitchell was treated by orthopedic services for irrigation and debridement with possible amputation of the 3rd and fourth fingers to repair nerves, arteries, and structures.

80.     As a result of CMPD, or members of their mutual aid network including all assisting officers to be identified from surrounding Cities and Counties, actions, Mr. Mitchell is permanently scarred physically, suffers permanent disfigurement of his right hand as a result of the amputation of some of his fingers. He lacks sensation in the areas of his hand that were lacerated and burned. He can no longer write with his right (dominant) hand and even simple

23

tasks cause painful cramping.

81.    Mr. Mitchell was also scarred emotionally as a result of this incident. Prior to the May 30, 2020 protest, Mitchell was an accomplished artist, photographer, videographer and dancer. The disfigurement to Mr. Mitchell's hand has prevented him from learning to play the piano and the saxophone, and he has lost the equilibrium and confidence to succeed as a dancer and an artist. Mr. Mitchell is often embarrassed and fearful when greeting friends and new acquaintances because of the appearance of his hand. The emotional stress that followed these injuries impacted his personal relationships; Mr. Mitchell's girlfriend of four years lost their first child in utero, an event Mr. Mitchell believes was caused in part by the stress that she endured as he attempted to recover from this trauma.

82.    The injuries Mr. Mitchell sustained on May 30, 2020 unlawfully circumscribed his exercise of his First Amendment rights. Today, Mitchell feels just as passionately about the problems in this country surrounding systemic police violence against Black Americans. But since May 2020, he has been fearful of attending protests and demonstrations, particularly within the jurisdiction of the CMPD. Mr. Mitchell would like someday to again to speak out in public spaces regarding important political and societal issues; at this time, however, his trauma and lack of confidence in the CMPD to act appropriately will not allow him to do so.

83.    Mr. Mitchell, with no significant medical history, presented to the emergency room with a ballistic injury to his right hand. The injuries caused severe pain to his right hand, worse with motion and better with rest. Mr. Mitchell had multiple open wounds in his right hand with the exposed bone of his fourth and third distal phalanx. There was a significant degloving injury of the right hand after the flash grenade went off. He presented with exposure of the bone from the tip of the distal interphalangeal (DIP) joint to the proximal interphalangeal (PIP) joint with significant soft tissue loss. The tissue of the hand

across the metacarpals was all charred and burned. There was a loose flap of soft tissue with the bones of the ring finger fully exposed. The remaining soft tissue was held loosely in place by a ring that had to be cut off in the emergency department. He could move all four digits but had 10/10 pain.

84. **Excessive Force and Municipal Liability**. On information and belief, the crowd management and crowd control policies, training, strategies, and tactics of the CMPD at the time of the George Floyd protests in the City of Charlotte were woefully deficient as compared to nationally accepted police standards and practices as of May/June 2020. Instead of focusing on crowd *management* techniques such as communication, mediation, and de-escalation to protect lawful assembly and free speech and prevent unnecessary harm, CMPD's

policies and training place undue emphasis on militaristic crowd *control* strategies — such as intimidation, platoon movements, and displays of force. The CMPD also trained its police officers to use force indiscriminately on crowds, as opposed to using tactics to isolate, lawfully remove and arrest individual "bad actors" who damaged property or posed a threat to safety.

85.   On information and belief, the mutual aid agencies likewise implemented woefully deficient training and policies regarding the use of less-lethal force, including chemical weapons, kinetic projectiles, and flash-bang grenades on crowds engaged in peaceful protest / civil demonstration. As alleged above, pursuant to the Mutual Aid Agreement or Operational Plan with the Charlotte-Mecklenburg Police Department, these mutual aid agencies and law enforcement personnel were obligated to obey the *lawful* orders of supervisory CMPD officers, but were nonetheless required to exercise their reasoned judgment as to whether such orders were consistent with the law. These officers also continued to be governed by the mutual aid agency's use of force policies and procedures. On information and belief, the mutual aid agencies and law enforcement personnel who engaged in indiscriminate use of less-lethal munitions and chemical weapons on May 30, 2020 did not receive any reprimand, punishment, or re-training after the Charlotte protests.

86.   Consistent with their outdated and inadequate training, CMPD officers on May 30, 2020 created confusion and chaos through overuse of chemical weapons on large crowds of peaceful demonstrators, with no attempt to ascertain or isolate any individuals who posed a threat of harm. Officers used chemical weapons (such as tear gas canisters) and other flash-bang grenades (including, *inter alia*, "stinger" grenades, which combine a flash component with an explosion of CS/OC chemicals and rubber pellets) that are indiscriminate in nature. These weapons cannot be carefully aimed, and thus are wholly unsuited for use in a public

space where many people are demonstrating lawfully and peacefully. Even in circumstances where a small subset of protesters act aggressively towards police, it is inappropriate and unconstitutional for officers to respond with violent force against the whole crowd.

87. On information and belief, the CMPD officers involved in the May 30, 2020 protest were not properly certified and/or trained to use these weapons to reduce the risk of injury or death.

88. CMPD's use of chemical weapons was not only unnecessary and excessive, the weapons were deployed in a particularly unsafe manner. For example, generally accepted police standards and practices as of May 2020 dictate that — when they are used — tear gas canisters must be fired at a high angle ***above*** human targets from a certain minimum distance. Pepper ball munitions should be fired to avoid the head and neck area, and flash-bang and "stinger" grenades should be deployed in a manner such that they land no less than 6-8 feet from any individual.

89. Video footage and contemporaneous media reports from the protests in Charlotte show that CMPD officers flagrantly ignored these safety practices and launched tear gas canisters at low angles, tossed grenades at close range to crowds of people, and fired kinetic projectiles directly at protestors, often at face-level, increasing the risk of severe injury.

90. Tear gas can cause severe coughing, crying, blurry vision, inflamed and burning eyes, and can make it difficult to breathe. It can cause skin to turn red, blister, develop a rash or a chemical burn. It also causes disorientation. Plaintiff Mitchell experienced many of these effects when chemical weapons were used on the protest crowds on May 30, 2022. Tear gas can cause respiratory arrest, vomiting and allergic reactions, and it can permanently damage the eyes, aggravate asthma symptoms, and cause brain injury. It can also have adverse effects

27

on pregnant women and fetuses. Tear gas chemicals are **banned in warfare**.

91.     Flash bang grenades emit an intense flash of light and a loud explosion with sound to distract and disorient temporarily. They can result in serious health risks to crowd members and bystanders, including burns and other injuries related to the explosion, eye-related injuries associated with the intense flash of light, and ear injuries (including irreversible hearing loss) associated with the loud noise. OC/CS "stinger" grenades combine these effects and that of OC/CS chemicals with a combustive explosion of rubber balls or pellets. A "stinger" grenade or other flash-bang grenade is capable of causing severe injury, such as those suffered by Plaintiff, if they explode within a few feet of a person or when being held.[4]

92.     Even when they combust 6 or more feet from a person, "stinger" flash grenades are particularly dangerous because when they explode, the rubber balls spray indiscriminately striking anyone nearby. Rubber balls can cause contusions, abrasions, and hematomas. Blunt impact may cause internal injuries, and impact to sensitive areas such as the face can fracture delicate facial bones, crack teeth or cause the loss of an eye. Rubber ball grenades cannot be carefully aimed, and for that reason, should only be used under very restrictive conditions. According to official records, CMPD officers detonated *sixty two* "stinger grenades" during the May 30-31, 2020 protests.

93.     In 2020, the Supreme Court of North Carolina ruled that such incendiary "flash bang" grenades constitute "**weapons of mass death and destruction**" under North Carolina criminal law. *See State v. Carey*, 373 N.C. 445 (N.C. 2020).

94.     The CMPD also indiscriminately fired pepper balls into crowds at the protests.

---

[4] *See, e.g.,* Feier, C. & Mallon, W. (2010). Injury Pattern of the Stingball. Journal of Emergency Medicine, 38(4) 444- 448; Wahl, Peter (2006). Injury Pattern of the Flash-Ball, a Less-Lethal Weapon Used for Law Enforcement, Journal of Emergency Medicine 31(3) (describing a patient who required hospitalization for heart and lung contusions).

Pepper balls are plastic spherical projectiles filled with powdered OC that are fired from air powered guns. The plastic spheres explode powder onto the person who gets hit, causing the person to struggle to breathe and be covered in the powder. Pepper balls have an immediate, painful, and incapacitating effect that creates a burning sensation to any exposed skin. Similar to rubber pellets/bullets, pepper ball kinetic projectiles themselves can cause series injury— even death—because of the velocity at which they are shot (up to 238 mph).

95. Throughout the protests occurring in late May and early June 2020, the CMPD routinely failed to provide verbal warnings or issue clear dispersal orders prior to using such indiscriminate force on crowds of protestors. On information and belief, even when warnings were issued, they were not communicated loud enough to enable the crowd to hear them.

96. On information and belief, the CMPD invited or otherwise permitted neighboring jurisdictions (other Cities and Counties) to send their law enforcement officers to the City of Charlotte to participate in and assist in the CMPD in responding to the protestors' speech and activities. The CMPD authorized the neighboring jurisdictions to follow their own polices, practices, and/or customs regarding the use of "less lethal" force during the protests, without ensuring these policies would not result in harm to citizens protesting in public spaces in the City.

97. CMPD also failed to conduct any joint training exercises with neighboring jurisdictions. As such, the City of Charlotte is responsible for the actions of law enforcement officers from other jurisdictions within this mutual aid network who participated in the CMPD's actions. It is unknown at this time how many OC / CS chemical weapons, flash-bang grenades, stinger grenades, or other "less lethal" munitions were employed by other law enforcement officers acting with the approval of the CPMD and the City of Charlotte.

29

98. As alleged above, the CMPD's indiscriminate and uncalled for use of "less lethal" munitions on peaceful protestors on May 30, 2022 was the result of an existing policy, custom, or practice in place in the City of Charlotte. Notably, protests against systemic racism, the killing of Black people at the hands of law enforcement, and police violence are not new to the City. Following the killing of Keith Lamont Scott, another Black man, by CMPD officers in 2016, local residents participated in widespread protests spanning many days. As with the 2020 Floyd protests, CMPD indiscriminately used force, including chemical munitions in response and in an effort to abridge, retaliate and punish protestors for criticizing the police.

99. In the wake of the protests following Mr. Scott's death, there was a public outcry over the use of chemical munitions and explosive devices (including stinger flash grenades) by the CMPD against peaceful protesters. Indeed, several Charlotte residents ran for and were elected to City Council on platforms to address police violence in the community, including CMPD's unlawful use of chemical and "less lethal" weapons during those protests.

100. On October 21, 2016, a group of seven Charlotteans (including at-large Councilmember Braxton Winston) filed a lawsuit alleging the CMPD "persistently violated [their] constitutional rights" during the Keith Scott protests, impeded citizens' exit from the demonstrations, indiscriminately assaulted peaceful demonstrators with chemical agents, shot at them with "less lethal" projectiles, engaged in physical and verbal abuse, failed to visibly identify themselves, and categorically labeled all demonstrations as unlawful assemblies. *See Winston, et al., v. City of Charlotte, et al.*, Case No. 3:16-cv-729 (W.D.N.C.). The Charlotte-Mecklenburg Defendants thus were on notice of the need to overhaul its approach to crowd management and control during demonstrations of free speech, particularly protests aimed at systemic police violence.

101. Despite public condemnation and citizen complaints surrounding indiscriminate use of chemical weapons and "less lethal" munitions against protesters in 2016, the Charlotte Mecklenburg Defendants *escalated* their unlawful and wanton use of those chemical weapons and munitions against peaceful protestors, including Plaintiff Mitchell, in the days following the death of George Floyd in 2020. In so doing, the City and CMPD demonstrated deliberate and wanton indifference, and/or acted in reckless disregard to the rights of citizens engaged in peaceful protest and protected speech.

102. In publicly released videos, a CMPD bike sergeant was disciplined due to comments made 'Wave goodbye, they're all about to get gassed,' which demonstrates how CMPD planned tear gas attack.[5]

103. Defendant Jennings is a municipal official with final policymaking authority and approved subordinates decision and the basis for it.

104. Upon information and belief, Defendant Jennings Jennings was a deputy police chief at the time of the incident.

105. Upon information and belief, then-Chief Putney was the final policymaker on police practices and provided the "marching orders" to quell the protests rather than just to prevent a riot—and that resulted in their constitutional violations.

106. In Charlotte, a pattern or practice has long existed of flouting the letter or spirit of CMPD policies against excessive use of force, favoring the right to protest, or racially discriminating. What happened to Plaintiff and other protestors went beyond that pattern or practice because the then-Chief issued the policies the officers were implementing against Plaintiffs and other protestors.

---

[5] https://www.charlotteobserver.com/news/local/article245270810.html

107. On May 30, 2020, police were armed with military-grade equipment and had a green light to deploy flash bangs and sting grenades to inflict pain as a deterrent—then, the consistency of officers' alleged actions supports the assertion that officers were implementing CMPD customs or policies.

108. CMPD Officers and mutual aid agency officers received minimal and ineffective training from Defendants City and CMPD Chief and were subject to vague, ineffective, and rarely enforced policies regarding the need to handle protestors without using force or using the least amount of non-lethal force necessary.

109. Upon information and belief, after May 30, 2020, Defendant Jennings ratified and defended CMPD's use of chemical agents in June due to "riotous activity."

110. Even though the Mayor and current Chief previously admitted officers' video-recorded conduct was improper, there have been zero disciplinary actions or criminal charges for excessive force, and zero efforts to relieve violent officers from duty or to remove them from special response teams.

111. Upon information and belief, the City has an unwritten policy, practice, or custom of condoning the use of excessive force against some protestors, such as those protesting police violence. Defendants' use of excessive force and the quelling of speech by police during peaceful protests demonstrates Defendants' deliberate indifference in the policies, training, supervision, and discipline needed to prevent officers and mutual-aid law enforcement personnel from violating constitutional rights. This alleged failure to investigate or discipline, or to make any meaningful policy reforms is a conscious choice to allow the pattern of alleged conduct to continue.

112. Defendants' custom of acquiescence was the cause of Plaintiff's injuries.

32

113. Videos from a June 2, 2020, attack by CMPD suggest there was a coordinated plan being executed at the time.

114. On June 19, 2020, a North Carolina judge issued a restraining order that limited CMPD's ability to employ these riot control agents to disperse crowds. In July 2021, civil rights organizations including the NAACP reached a settlement with the City of Charlotte over the tactics employed by the CMPD during the May-June 2020 George Floyd protests. The settlement imposed common sense restrictions on police use of force — bans on the use of CS gas on protestors, as well as a ban on "kettling," and requirements such as that protesters be given adequate notice and time to disperse, and that kinetic impact projectiles could not be shot indiscriminately into crowds. However, the settlement did not address the use of flash-bang grenades or sting grenades.

115. On February 25, 2011, CMPD Officer Fred Thorton died after he suffered life threatening injuries as a result of a flash bang deployment.

116. On February 25, 2011 Fred Thornton was assigned as rear security at a residence during a SWAT action, and was issued a flashbang to use (or not use) at his discretion. After the successful SWAT action. Officer Thornton eventually returned home and lost his life in a tragic accident.

117. **I**It is believed that Officer Thornton had prepared to deploy an issued FSDD by removing the cotter pin from the device at the scene of a search warrant and that Officer Thornton reinserted one "leg" of the cotter pin back into the device making the device stable after he did not deploy the device.

118. Upon information and belief, Officer Thornton kept the device on his person and returned to the SWAT office then drove his assigned SWAT vehicle to his residence.

119.  Upon information and belief, investigators believe Thornton had prepared to deploy the flash-bang device by removing the pin that prevents it from exploding. When Thornton decided he didn t need to use the distraction device, investigators think he put part of the pin back into the grenade, which violates CMPD s SWAT training and procedures, and is not an authorized way to make the grenade safe.

120.  Upon information and belief, if a SWAT officer pulls the pin out, he s supposed to activate the flash-bang device by throwing it into a safe location, according to the department.

121.  The flashbang that killed Officer Thornton has been inspected by an ATF Post Blast Investigator and at present, there are "no reasons to believe or evidence to suggest the device safety features failed or that a malfunction caused the device to activate" said former CMPD Chief Monroe.

122.  While in his garage Officer Thornton removed the cotter pin which was keeping the device stable and shortly thereafter the device activated.

123.  The Charlotte-Mecklenburg Police Department has been using the Def-Tec 25 for five years, and according to the former Chief's statement, will continue to use it in the foreseeable future.

124.  Despite knowing the inherent dangers of flash bang devices, Defendants used such distraction devices against Plaintiff.

125.  After Thornton's death, former Chief Monore stated, "It's just one more example of the work that we expect of our people and the risk that they're involved in each and every day, and it's a risk that all too often costs our members their lives."

126.  Upon information and belief, the City continues to buy and store flash-bang

grenades and sting grenades since the 2020 settlement.[6]

127. **Floyd Case Law.** Since the last year's protests in the wake of George Floyd's killing, there have been no fewer than seventy-three cases exploring how these protests shine a light on existing First Amendment or Fourth Amendment principles. ("Floyd Caselaw").

128. Each case in the Floyd Caselaw presents a similar tale: protestors gather near buildings of community significance, such as state capitol buildings, courthouses, and police stations, to express their horror and outrage at the killings of Black Americans at the hands of police officers; violence occurs at the hands of demonstrators and officers alike; most demonstrators chant, sing, and exercise a number of nonviolent and constitutionally protected activities; other demonstrators serve as an accelerant, engage in violence, and ignore police

---

[6] https://www.charlotteobserver.com/news/local/article256549561.html

commands; at various points, officers protecting municipal, federal, and private properties are subject to threats, projectiles, and sometimes violence; dispersal orders or instructions for how to comply with police orders are either unheard, unprovided, or unheeded; police deploy less-lethal munitions, resulting in injuries to violent, nonviolent, and compliant protestors as well as passersby.

129.  There are several prevailing legal principles from the Floyd Caselaw. First, all individuals have a First Amendment right to protest the actions of government officials, including police officers, without fear for their safety. Second, police officers, almost by definition, operate in an intense and volatile workplace context. Third, the Floyd Caselaw arose in unprecedented times that have upended life especially when one factors a pandemic that reminded us of the structural, unequal access to healthcare, particularly for Black, brown, indigenous, and rural communities, those with pre-existing illnesses or stigmatized health profiles, and those with mobility limitations. Finally, the Floyd Caselaw courts have recognized an inherent difficulty in drawing an enforceable line that is sensitive to officers' ability to quell violence and prevent the destruction of property without crossing the line into chilling free speech and abusing those who wish to exercise it.

130.  Plaintiff Mitchell was not arrested for criminal conduct, yet he now has to live without his fingers.

131.  Plaintiff Mitchell was not charged with a crime, yet he now has to live without his fingers.

132.  Plaintiff participated in peaceful demonstrations for the first time, and has a result, he now has to live without his fingers.

# FIRST CLAIM FOR RELIEF
## First Amendment Violation
(Against all Defendants.)
(42 U.S.C. § 1983)

133.  Plaintiff Mitchell hereby incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

134.  By virtue of the foregoing acts, Defendants violated Plaintiff's rights to freedom of speech, assembly, and association under the First Amendment to the U.S. Constitution, when acting under color of law, they declared the peaceful protests to be unlawful assemblies and tear gassed and shot flashbang grenades and other projectiles at Plaintiff and others.

135.  The Defendants' actions — namely, the use of excessive force against peaceful protestors and the ratification of the same — can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

136.  On information and belief, Charlotte-Mecklenburg Defendants' authorization or approval of the use of chemical weapons and "less-lethal" force against protestors was motivated by the viewpoint being expressed by the demonstrators.

137.  The actions of Defendants had the purpose and effect of suppressing the lawful protest activity of Plaintiff Mitchell.

138.  Defendants' use of force and the City's policy, practice, or custom of authorizing the use of chemical weapons, flash-bang grenades, and kinetic projectiles to control and suppress demonstrations against systemic police violence is not a reasonable regulation of the time, place, or manner of Plaintiff's First Amendment protected activity and caused substantial physical and psychological injuries, and pain and suffering, to the Plaintiff.

139.  Plaintiff dreamed to be a part of the movement to protect Black lives from police

violence and enact change. Initially, he engaged in a peaceful demonstration in the City without fear that CMPD officers would endanger his physical wellbeing and freedom of expression with the unjustified and indiscriminate use of "less lethal" and chemical weapons. The Plaintiff's efforts at peaceful activism and constitutionally protected speech has been chilled by the unlawful actions of the Defendants as alleged herein.

140. CMPD's use of crowd-control weapons chilled Plaintiff's speech.

141. Exposure to flash bangs are extremely painful, as are projectiles lobbed into the crowd,which resulted in lasting and serious physical injuries.

142. The individual Defendants acted with reckless and/or callous indifference to the federally protected rights of Plaintiff and are therefore liable for punitive damages.

143. As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated, entitling him to relief.

### SECOND CLAIM FOR RELIEF
**Fourth Amendment Excessive Force and Unlawful Seizure**
(Against all Defendants.)
(42 U.S.C. § 1983)

144. Plaintiff hereby incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

145. By virtue of the foregoing, Defendants violated Plaintiff's rights to be free from excessive force and unlawful seizure when acting under color of law, they tear gassed, and shot flashbang grenades and other projectiles at Plaintiff.

146. Plaintiff Kyre Mitchell suffered grievous physical injuries, including but not limited to the loss of two fingers on his right (dominant) hand and deep burns to his palm. These injuries cause Mr. Mitchell pain and embarrassment to this day, and permanently prevent or limit

38

his ability to do activities he used to enjoy, or which used to provide him income. Mr. Mitchell has also suffered disorientation, sleeplessness, extended and continuing periods of fearfulness and anxiety as a result of Defendants' unlawful actions on May 30, 2020.

147. The individual Defendants acted with reckless and/or callous indifference to the federally protected rights of Plaintiff and are therefore liable for punitive damages.

148. As a direct and proximate result of these Defendants' actions, Plaintiff Mitchell's constitutional rights were violated entitling him to relief.

### THIRD CLAIM FOR RELIEF
### *Monell* and Supervisory Liability
(Against the City of Charlotte, Mutual Aid Agencies, Chief Putney, Deputy Chief Vorhees, and Defendants Dance, Bowling, Rorie and Sherwood)
(42 U.S.C. § 1983 – Free Speech and Excessive Force)

149. Plaintiff Mitchell hereby incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

150. The City of Charlotte and Chief Putney have systematically failed to adequately select, train, and supervise police officers under their control to prevent officers from interfering with people's First Amendment rights to freedom of speech, assembly, and association and people's Fourth Amendment right to be free from excessive force and unlawful seizure when acting under color of law and to refrain from punishing people in retaliation for the exercise of these rights.

151. The City and Chief Putney have failed to adequately hold officers accountable for violations of people's rights, thereby condoning and encouraging it. The City was aware that the protests were largely peaceful, and yet permitted its police officers to use intimidation and force to suppress these demonstrations.

152.     City policymakers, including Former Chief Putney, and Current Chief Jennings acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, widespread use of "less-lethal" force against protesters who do not pose any threat to property or persons; by failing to properly train, supervise, and discipline CPMD officers regarding the appropriate use of force during largely peaceable demonstrations or protests; and also by failing to rectify the City's unconstitutional custom of CMPD officers of using "less-lethal" force and chemical weapons to control and suppress protests, as shown during the 2016 Keith Lamont Scott protests.

153.     City policymakers, including Former Chief Putney, and Current Chief Jennings failed to adequately hold officers accountable for violations of people's rights, thereby condoning and encouraging these violations. The City ratified in real time CMPD officers' indiscriminate use of chemical weapons and other "less-lethal" force during the George Floyd protests in late May and early June 2020. The City was aware of its officer's behavior and continued to encourage and/or ratify it.

154.     The failures of City policymakers, including Former Chief Putney, and Current Chief Jennings as set forth herein constitute unconstitutional customs and practices of the City of Charlotte.

155.     Defendants Dance, Bowling, Rorie and Sherwood are supervisory officers with the CPMD who were on duty and present at the May 30, 2020 protest and who lead or directed "platoons" of CPMD officers and who directed and/or approved of the indiscriminate use of chemical weapons, flash-bang grenades, and kinetic projectiles on peaceful protesters.

156.     In the manner described above, these Defendants were personally involved in or personally directed, controlled, and/or authorized the actions of their subordinate officers which

violated Plaintiff's rights under the First Amendment. Defendants set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiff Mitchell of his constitutional rights. Defendants knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to Plaintiff's rights.

157.    As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated, entitling him to relief.

**FOURTH CLAIM FOR RELIEF**
**State Law Assault and Battery**
(Against all Defendants)

158.    Plaintiff Mitchell hereby incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

159.    The individual Defendants' unlawful actions in deploying chemical weapons, kinetic projectiles and flash-bang grenades on Plaintiff Mitchell, into a crowd of protesters whom were protesting peacefully, caused Mr. Mitchell to reasonably fear that he would suffer physical injury. Mr. Mitchell did in fact suffer a violent, harmful, and offensive touching by the CMPD officers who utilized these weapons and "less-lethal" force on May 30, 2020.

160.    The individual Defendants' battery upon Plaintiff Mitchell was unnecessary and unwarranted in the performance of their official duties as sworn law enforcement officers and constituted an unreasonable and excessive use of force.

161.    By the above-described acts and/or omissions and/or failures to supervise and/or failure to institute and execute adequate training and policies on part of Defendants, as alleged herein, Plaintiff was assaulted and battered, entitling him to damages under North Carolina law.

162. The aiding and abetting and/or failure to intervene and/or failure to prevent the assault and battery gives rise to liability on the part of other, to be identified City of Charlotte employee defendants, and/or members of their mutual aid network including all assisting officers to be identified from surrounding Cities and Counties.

163. As a direct and proximate result of the Defendants' reckless, willful, wanton, malicious, and unlawful conduct, Plaintiff suffered and continues to suffer damages, including, but not limited to, physical pain and emotional suffering.

**FIFTH CLAIM FOR RELIEF**
**State Law False Imprisonment**
(Against all Defendants)

164. Plaintiff Mitchell hereby incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

165. Through use of "kettling" (corralling) peaceful protestors (including Plaintiff), cutting off exit points, and then unleashing debilitating chemical weapons indiscriminately onto confined crowds, Defendants illegally restrained the Plaintiff by force or threat of force without his consent. There was no justification for Defendants' militant crowd control tactics, nor their use of force; as such, the restraint of Plaintiff was unlawful.

166. By the above-described acts and/or omissions and/or failures to supervise and/or failure to institute and execute adequate training and policies on part of defendants, as alleged herein, Plaintiff had his liberty restrained without legal process, constituting false imprisonment under North Carolina law.

167. As a direct and proximate result of the Defendants' reckless, willful, wanton, malicious, and unlawful conduct, Plaintiff Mitchell suffered and continues to suffer damages, including, but not limited to, physical pain and emotional suffering.

42

## SIXTH CLAIM FOR RELIEF
### Willful, Wanton, or Gross Negligence
(Against all Defendants)

168.    Plaintiff Mitchell incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

169.    At all material times, each defendant owed each plaintiff the duty to act with due care in the execution and enforcement of any right, law, or legal obligation; and reasonable care.

170.    On information and belief, Plaintiff's injuries were caused by one or more of the Defendants Tucker, Putnam, Martinez, Sherwood, Long, Broadway, Potter, Shue, Braswell, Kaminski, Dowell, Lee, and Keller. These actions were willful, wanton, and/or grossly negligent.

171.    The actions by these Defendants in indiscriminately deploying chemical weapons into a crowd (one of whom was Plaintiff), firing kinetic projectiles at Plaintiff (including at the head and neck area), and, most notably, deploying a flash-bang or combustive "stinger" grenade which landed directly at Plaintiff's feet, were excessive and inappropriate under the circumstances because the protest was peaceful, and were done needlessly, and in reckless disregard for the life and physical safety of Plaintiff Mitchell.

172.    Defendants Dance, Bowling, Rorie and Sherwood, as supervisory officers with the CPMD, directed and/or approved of the indiscriminate use of chemical weapons, flash-bang grenades, and kinetic projectiles on peaceful protesters, including Plaintiff.

173.    These individual Defendants actions exceeded accepted police practice, and were in violation of the laws of the State of North Carolina.

174.    The wrongful conduct of these individual Defendants occurred in the course or scope of their employment. Their negligence is imputed to the CMPD under the principle of

*respondeat superior.*

175.    This violation of generally accepted law enforcement custom and practice was the direct and proximate result of grossly inadequate supervision and/or training policies and practice on the part of the CMPD, and was a direct and proximate result of Plaintiff's injuries.

176.    Plaintiff is entitled to punitive damages because these Defendants acted with callous or reckless indifference, or deliberate, willful, and wanton disregard of Plaintiff's rights.

177.    By the acts and/or omissions alleged above, these Defendants acted with gross negligence and breached their duty of due care owed to Plaintiff, which foreseeably resulted in the suffering of damages by Mr. Mitchell.

178.    The Defendant City of Charlotte, pursuant to N.C.G.S. § 160A-485.5, has adopted an ordinance waiving its governmental immunity from the negligent acts of its employees to the same extent that sovereign immunity is waived under the State Tort Claims Act, *see* N.C.G.S. 143-291, et seq.,  as to the negligent acts of state employees within the course and scope of their employment. If these Defendants were state employees, their negligence would be actionable under the State Tort Claims Act. Thus, their negligence is actionable here.

179.    Upon information and belief, the waiver is limited to $1 million in damages.

### SEVENTH CLAIM FOR RELIEF
### Simple Negligence
(Against all Defendants)

180.    Plaintiff Mitchell incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

181.    At all material times, each defendant owed each plaintiff the duty to act with due care in the execution and enforcement of any right, law, or legal obligation; and reasonable care.

44

182.     Defendants Tucker, Putnam, Martinez, Long, Broadway, Potter, Shue, Braswell, Kaminski, Dowell, Lee, and Keller breached this duty of care by using force against Plaintiff without cause or justification, specifically by deploying chemical weapons indiscriminately on a crowd of peaceful protesters (one of whom was Plaintiff), firing kinetic projectiles directly at Plaintiff and others (including in the face and neck area), and, most notably, launching a flash-bang or combustive "stinger" grenade which landed directly at Plaintiff's feet.

183.     Defendants Dance, Bowling, Rorie and Sherwood, as supervisory officers with the CPMD, directed and/or approved of the indiscriminate use of chemical weapons, flash-bang grenades, and kinetic projectiles on peaceful protesters, including Plaintiff.

184.     By the acts and/or omissions alleged above, Defendants acted with negligence and breached their duty of due care owed to Plaintiff, which foreseeably resulted in the suffering of damages by Mr. Mitchell.

185.     As alleged above, Defendant's negligence is imputable to the CMPD under the doctrine of *respondeat superior*, and the City of Charlotte's waiver of immunity pursuant to is N.C.G.S. § 160A-485.5, the City is liable for the negligent acts of its employees, each of whom acted within the course and scope of his employment.

## EIGHTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress
(Against all Defendants)

186.     Plaintiff Mitchell incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

187.     At all material times, each defendant owed each plaintiff the duty to act with due care in the execution and enforcement of any right, law, or legal obligation; and reasonable care.

188.     As alleged above, the Defendants Tucker, Putnam, Martinez, Long, Broadway,

Potter, Shue, Braswell, Kaminski, Dowell, Lee, and Keller, and CMPD supervisory officers Dance, Bowling, Rorie and Sherwood, breached this duty by using chemical weapons and flash-bang grenades on Plaintiff and others at the May 30, 2020 protest, or otherwise directing, aiding and abetting, and/or approving of the use of such force on Plaintiff.

189.    By the acts and/or omissions alleged above, Defendants acted with negligence and breached their duty of due care owed to Plaintiff, which foreseeably resulted in the suffering of damages by Mr. Mitchell.

190.    Plaintiff suffered severe emotional distress as a result of Defendants' negligence.

191.    As alleged above, Defendant's negligence is imputable to the CMPD under the doctrine of *respondeat superior*, and the City of Charlotte's waiver of immunity pursuant to is N.C.G.S. § 160A-485.5, the City is liable for the negligent acts of its employees, each of whom acted within the course and scope of his employment.

## NINTH CLAIM FOR RELIEF
### Failure to Train and or Supervise Under 42 U.S.C § 1983
(Chief Putney, Deputy Chief Vorhees,
and Defendants Dance, Bowling, Rorie and Sherwood)

192.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

193.    Defendants Chief Putney, Deputy Chief Vorhees, and Defendants Dance, Bowling, Rorie and Sherwood failed to properly supervise mutual aid agencies, despite having actual knowledge of the need for better and additional training and supervision.

194.    The Police Foundation informed Defendants Chief Putney, Deputy Chief Vorhees, and Defendants Dance, Bowling, Rorie and Sherwood after the 2017 protests use of

mutual aid agencies of the need for better training and supervision.

195.    Neither Defendants Chief Putney, Deputy Chief Vorhees, and Defendants Dance, Bowling, Rorie and Sherwood adequately supervised their subordinate officees or intervened to ensure that mutual aid agencies or CMPD officers complied with the Department's policies for use of force.

196.    Defendants Chief Putney, Deputy Chief Vorhees, and Defendants Dance, Bowling, Rorie and Sherwood failed to take any steps to correct or prevent unconstitutional activity from recurring as again on June 2, 2022, protestors were kettled and harmed.

197.    Because of Defendants' inaction, Plaintiffs were wrongfully prosecuted and held in jail.

198.    The repeated and sustained failures of Defendants to supervise officers of CMPD and those of mutual aid agencies  constituted deliberate indifference to and reckless disregard for the rights and life of Plaintiffs and the public.

## TENTH CLAIM FOR RELIEF
### Civil Conspiracy under 42 U.S.C. § 1983
### Against ALL Defendants

199.    Plaintiff repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

200.    Defendants, acting under color of state law, conspired to deprive Plaintiff of his constitutional rights.

201.    Defendants, together and in agreement with one another by and through the mutual aid agreement set forth in Paragraph 14 and various meetings where they were made aware of the plan to chill Plaintiffs free speech through acts of violence including use of flash bangs, consipred to deprive Plaintiff of his constitutional rights.

47

202. Specifically, despite knowing a flash bang was not reasonable under the circumstances, the use of a [flash-bang] grenade was not justified by any alleged particular risk Plaintiff posed.

203. Defendants conspired to cause Plaintiffs injuries through the use of excessive force violation of the Fourth Amendment.

204. Defendants conspired to retaliate against Plaintiff's exercise of his rights violation of the First Amendment and N.C. Const.

205. Defendants participated directly through the use of a mutual aid agreement .

206. Defendants also acquiesced[7] in the conspiracy by having full knowledge of the conspiracy and failing to intervene or prevent the injuries sustained by Plaintiff.

## ELEVENTH CLAIM FOR RELIEF
### (N.C. Const., Art. I, §§ 19, 20 Unreasonable Seizure, Excessive Force)

207. All prior paragraphs are incorporated by reference.

208. Plaintiff has a fundamental right to be free from conscience-shocking, extrajudicial punishment without due process pursuant to "the law of the land" under Article I, Section 19 of the North Carolina State Constitution.

209. Plaintiff has a fundamental right to be free from deprivation of life, liberty and property without due process of law.

210. Plaintiff was deprived of life, liberty and property by the actions of CMPD.

211. Defendants, acting under color of law, have violated, and unless enjoined by this Court, will continue to violate Plaintiff's right to be free from unreasonable and unnecessary

---

[7] Hafner v. Brown, 983 F.2d 570, 576–78 (4th Cir. 1992) (finding that a claim of civil conspiracy can be proven "by a mere showing of acquiescence" in the conspiracy.).

seizure and excessive force in the course of a detention, as guaranteed by Art. I, §§ 19 and 20 of the North Carolina Constitution.

212.  The actions complained of were pursuant to by customs, policies, directives, practices, acts, and omissions of Defendants, who encouraged, authorized, directed, condoned, and ratified the unconstitutional and unlawful conduct complained of herein.

213.  Plaintiff has suffered irreparable harm by Defendants' infringement of his federal and state constitutional rights, particularly while exercising his First and Fourteenth Amendment rights, and will continue to suffer irreparable harm unless relief is granted.

214.  Plaintiff was not given due process of law prior to the deprivation of life, liberty and property.

215.  Defendants' unwarranted and egregious actions of deliberately trapping peaceful protesters and flash bang explosives at those gathered peacefully to object to police violence, is a shocking use of unwarranted and unreasonable force in violation of the Plaintiff's due process rights as guaranteed by Article I, Section 19 of the North Carolina Constitution.

216.  Plaintiff has no adequate remedy at state law to address the violation of his constitutional rights.

217.  Plaintiff seeks the costs of this action. Given the flagrant and deliberate violation of state constitutional rights by the City through its agents, Plaintiffs seek attorneys' fees under N.C. Gen. Stat. § 6-21.7.

## <u>TWELFTH CLAIM FOR RELIEF</u>

### **(North Carolina State Constitution - Article I, Section 14)**

218.  All prior paragraphs are incorporated by reference.

219.   Plaintiff has a fundamental right to freedom of speech under Article I, Section 14 of the North Carolina State Constitution.

220.   Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' constitutionally protected activity.

221.   Defendants' actions were not justified by a compelling—or even substantial—government interest.

222.   Assuming, arguendo, that there was a compelling government interest in dispersing protesters, Defendants' actions on June 2 were not narrowly tailored to serve that government interest in a lawful manner.

223.   Defendants' egregious actions of kettling peaceful protesters and hurling flash bang explosives at those gathered peacefully to object to police violence is a use of unwarranted force in reaction to their protected speech and violates Article I, section 14 of the North Carolina Constitution.

224.   Plaintiff has no adequate remedy at state law to address the violation of their constitutional rights.

225.   The continued threat of such violent tactics only serves to chill protected speech and dissuade peaceful protesters from engaging in their constitutional right to express his views, and has in fact chilled Plaintiff's and made him fearful to participate in future demonstrations.

226.   Plaintiff seeks the costs of this action. Given the flagrant and deliberate violation of state constitutional rights by the City through its agents, Plaintiffs seek their attorneys' fees under N.C. Gen. Stat. § 6-21.7.

<u>THIRTEENTH CLAIM FOR RELIEF</u>
**(North Carolina State Constitution - Article I, Section 12)**

227.   All prior paragraphs are incorporated by reference.

50

228.    Plaintiffs have a fundamental right to assemble under Article I, Section 12 of the North Carolina State Constitution.

229.    Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' constitutionally protected activity.

230.    Defendants' actions were not justified by a compelling—or even substantial—government interest.

231.    Assuming, arguendo, that there was a compelling government interest in dispersing protesters, Defendants' actions on June 2 were not narrowly tailored to serve that government interest in a lawful manner.

232.    Using crowd-control weapons and equipment, including but not limited to tear gas, flash bang explosives, rubber bullets and pepper balls, and unlawful "crowd control" containment practices such as kettling on peaceful marchers violates the right to assemble under the North Carolina Constitution.

233.    Plaintiffs have no adequate remedy at state law to address the violation of their constitutional rights.

234.    Plaintiffs also seek the costs of this action. Given the flagrant and deliberate violation of state constitutional rights by the City through its agents, Plaintiffs seek attorneys' fees under N.C. Gen. Stat. § 6-21.7.

## DAMAGES

235.    As a result of the actions of defendants as set forth above, Plaintiff Mitchell has been injured and suffered damages as follows: he had his rights to free speech, to peaceably assemble and redress his grievances irreparably harmed; he suffered physical and psychological harm; he incurred expenses for medical care; and he lost income.

**WHEREFORE**, Plaintiff requests that this Court grant them relief as follows:

1. Declaratory relief to determine that the acts and policies by Defendants described herein, which allow for the use of a weapon of mass destruction in a highly dense public space, violated Plaintiff's rights under the Civil Rights Act and applicable North Carolina laws;

2. That this Court issues an order that Defendants cannot utilize flash bombs, in a highly dense public space, on an individual engaged in peaceful, non-criminal activity in the City of Charlotte for the purpose of frightening them or punishing them for exercising their constitutional rights;

3. Enjoins all unlawful practices complaint about herein and imposes affirmative injunctive relief requiring each Defendant and its partners and/or agents to take affirmative steps to counteract and cure their unlawful and discriminatory practices;

4. General damages, in an amount to be determined;

5. Special damages, in an amount to be determined;

6. Nominal damages;

7. Punitive damages where appropriate;

8. Reasonable attorneys' fees under 42 U.S.C. § 1988 and costs of suit;

9. Such other and further relief as the Court may deem proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff Mitchell hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Dated: January 5, 2023

*/s/ Micheal L. Littlejohn Jr*
Micheal L. Littlejohn Jr.,
N.C. Bar No. 49353
Littlejohn Law, PLLC
PO Box 16661,
Charlotte, North Carolina 28297
T: (704) 322-4581 | F: (704) 625- 9396
Email: mll@littlejohn-law.com

*/s/ Darlene Harris*
Darlene Harris
N.C. State Bar No. 46087
Oakhurst Legal Group
5309 Monroe Road, Suite 118
Charlotte, NC 28205
Telephone: (704) 243-8178
E-mail: Darlene@oaklg.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that I have served the foregoing Plaintiff's First Complaint upon Counsels for Defendants via e-mail and in a post office of official depository under the exclusive care and custody of the United States Postal Service, via Certified Mail, Return Receipt requested in a properly addressed envelope as follows:

> Roger A. McCalman
> Attorney for Defendant City of Charlotte
> Charlotte City Attorney's Office
> 600 E. Fourth Street
> Charlotte, North Carolina 28202
> PH: 704.432.5397
> FAX: 704.632-8160
> Roger.McCalman@charlottenc.gov
>
> Ryan G. Rich
> Senior Assistant City Attorney – Lead
> (Litigation)
> Office of the City Attorney
> Charlotte-Mecklenburg Government
> Center
> 600 East 4th Street | Charlotte, NC 28202
> (M) 704-572-3611|
> Ryan.Rich@charlottenc.gov |

This the 5th day of January, 2023.

**BY: KYRE MITCHELL**

*/s/ Micheal L. Littlejohn Jr.*
Micheal L. Littlejohn Jr.
N.C. Bar No. 49353
Littlejohn Law PLLC
Email: mll@littlejohn-law.com
*Counsel for Plaintiff Kyre Mitchell*

*/s/ Darlene Harris*
Darlene Harris
N.C. State Bar No. 46087
Oakhurst Legal Group
E-mail: Darlene@oaklg.com
Counsel for Plaintiff

54